UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| ) | Case No. 1:22-cv-10295-AK |
| PROLERIZED NEW ENGLAND, LLC; ) | |
| METALS RECYCLING, L.L.C.; JOINT ) | |
| VENTURE OPERATIONS, INC.; PROLERIDE ) | |
| TRANSPORT SYSTEMS, INC.; and ) | |
| MAINE METAL RECYCLING, INC., ) | |
| ) | |
| Defendants. ) | |

## CONSENT DECREE

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this action on February 22, 2022 against: Prolerized New England, LLC; Metals Recycling, L.L.C.; Joint Venture Operations, Inc.; Proleride Transport Systems, Inc.; and Maine Metal Recycling, Inc. (collectively "Defendants") alleging violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "Act"), and seeking declaratory and injunctive relief, civil penalties, and attorney fees and costs;

WHEREAS, CLF is a nonprofit environmental organization incorporated in Massachusetts;

WHEREAS, Defendants operate three scrap metal facilities in Massachusetts, namely: the "Attleboro Facility," located at 136 Bacon Street in Attleboro, Massachusetts 02703; the "Everett Facility," located at 69 Rover Street in Everett, Massachusetts 02149; and the

1

119222199.3 0068163-00156

"Worcester Facility," located at 20 Nippnapp Trail in Worcester, Massachusetts 01607 (collectively, the "Facilities");

WHEREAS, CLF alleges in its complaint dated February 22, 2022 (the "Complaint") that Defendants violated the 2015 and 2021 Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (the "2015 MSGP" and the "2021 MSGP," collectively, the "MSGPs") and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and applicable regulations;

WHEREAS, this Consent Decree is a settlement of disputed facts and law, and is not an admission or adjudication regarding any allegations by CLF in this case nor evidence of any wrongdoing or misconduct on the part of Defendants;

WHEREAS, Plaintiff and Defendants (collectively the "Parties") have negotiated this Consent Decree in good faith and at arm's length, and agree that the settlement of the above-captioned action (the "Action") through this Consent Decree without further litigation is in the public interest, and is a fair, reasonable, and appropriate means of resolving all claims in the Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance the environment by improving water quality in Massachusetts;

WHEREAS, the Parties consent to the entry of this Consent Decree without further trial, argument, or appeal;

WHEREAS, pursuant to 33 U.S.C. § 1365(c), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the 45 day review period mandated by the Clean Water Act;

NOW, THEREFORE, before the taking of any testimony, below, and with the consent of

119222199.3 0068163-00156

the Parties,

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 33 U.S.C. § 1365(a)(1) (Clean Water Act jurisdiction) and 28 U.S.C. § 1331 (federal question). An actual, justiciable controversy exists between the Parties. The requested relief is authorized under 28 U.S.C. §§ 2201-2202 and 33 U.S.C. § 1365(c)(1).

2.    Venue properly lies in this Court and district pursuant to 33 U.S.C. § 1365(c)(1), because the events giving rise to this action occurred at the Defendants' Facilities in Attleboro, Massachusetts; Everett, Massachusetts; and Worcester, Massachusetts, which are all located within this judicial district.

3.    Plaintiff gave the Defendants notice by letter (the "Notice Letter") of the violations alleged in the Complaint more than 60 days prior to commencement of this lawsuit. Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Acting Regional Administrator of EPA Region 1, the Department of Justice Citizen Suit Coordinator, and the Massachusetts Department of Environmental Protection ("MassDEP"). Neither EPA nor MassDEP commenced any action prior to Plaintiff's filing of the Complaint.

4.    The Defendants consent to this Court's jurisdiction and to venue in this judicial district. The Defendants consent to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

5.    This Court shall retain jurisdiction over this case until the Termination Date for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying

3

119222199.3 0068163-00156

this Consent Decree, pursuant to Sections X (Dispute Resolution) and XIII (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## II. RELEASE

6.      This Consent Decree is a full and complete settlement and release of all the claims in the Complaint and the Notice Letter and all other claims known or unknown existing as of the date of entry of the Consent Decree and arising from operation of the Facilities that could be asserted under the Clean Water Act, 33 U.S.C. §§ 1251-1387. Upon termination of this Consent Decree, these claims are released and dismissed with prejudice. Enforcement of this Consent Decree is Plaintiff's exclusive remedy for any violation of its terms.

7.      With the exception of actions to enforce this Consent Decree, during the term of the Consent Decree, CLF will not support, financially or otherwise, any person to sue the Defendants for any and all claims alleged against the Defendants in the Complaint and all other claims known and unknown, existing as of the Effective Date that could be asserted under the Clean Water Act, arising from operation of the Facilities.

## III.    APPLICABILITY

8.      Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, the Parties and their respective successors and assigns.

9.      The duties and obligations under this Consent Decree shall not be modified, diminished, terminated, or otherwise altered by the transfer of any legal or equitable interest in the Facilities or any part thereof. However, if a Facility ceases industrial operations and submits a notice of termination ("NOT"), the requirements of Sections V (Compliance Measures), VI (Compliance Monitoring and Reporting), and VIII (Stipulated Payments) *infra* shall no longer apply to that Facility.

4

119222199.3 0068163-00156

10. If, during the pendency of this Consent Decree, the Defendants cease to operate any of the Facilities, and if there is a successor to the operations, the Defendants shall serve a copy of this Consent Decree upon the successor operator at least 30 days prior to the contemplated transfer of operations and shall contemporaneously inform the Plaintiff of such transfer. In the event of a transfer of operations, the Parties shall petition the Court to modify the Consent Decree to substitute the successor operator for the Defendants as a party hereto as agreed to by Plaintiff and the owner of the Facility.

11. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure of any of its officers, directors, employees, or agents to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.   DEFINITIONS

12. Terms used in this Consent Decree that are defined in the Clean Water Act, in regulations promulgated by EPA pursuant to the Act, or in the 2021 MSGP shall have the meanings assigned to them in the Act, such regulations, or in the 2021 MSGP unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

 a. "30% Design": The design drawing for Infrastructure Improvements at the Worcester Facility prepared to an approximately 30% level. The 30% Design shall include an estimated construction schedule; engineering plans showing a plan view layout of proposed improvements showing grading, paving, and stormwater infrastructure, and profiles of gravity conveyance lines; and a basis of design report.

 b. "60% Design": The design drawing for Infrastructure Improvements at the

5

119222199.3 0068163-00156

Worcester Facility prepared to an approximately 60% level and suitable for seeking permitting approval from local permitting authorities, as needed. The 60% Design shall include: any permit application package, engineering plans, stormwater technical reports, Massachusetts Environmental Policy Act documentation if needed, and other deliverables necessary for permitting approval.

c.    "90% Design": The design drawing for Infrastructure Improvements at the Worcester Facility prepared to an approximately 90% level and suitable for soliciting bids for construction of the improvements. The 90% Design shall include an invitation to bid, engineering plans, and specifications.

d.    "100% Design": The complete and final design drawings and specifications for Infrastructure Improvements at the Worcester Facility suitable for procuring equipment and guiding construction activities.

e.    "Annual Report": The yearly report required under Section 7.4 of the 2021 MSGP.

f.    "Best Management Practices": Stormwater control measures, not including infrastructure construction or the installation of new stormwater treatment systems, designed to minimize pollutant discharges. Best Management Practices may, as necessary, include more frequent cleaning, sweeping, inspection and maintenance of drain inlet protection, reducing exposure of sources of stormwater pollution, and routine maintenance and repair of existing stormwater control infrastructure. The Best Management Practices shall include all operations, maintenance, and other practices

6

119222199.3 0068163-00156

currently required by each Facility's applicable Stormwater Pollution Prevention Plan, as well as the Best Management Practices detailed in Exhibit A to this Consent Decree.

g.    "Corrective Action Triggering Events": Those events which are defined as either "Conditions Requiring SWPPP Review and Revision to Ensure Effluent Limits are Met" in Section 5.1.1 of the 2021 MSGP or as "AIM Triggering Events" in 5.2.2 of the 2021 MSGP.

h.    "Discharge Monitoring Report": The quarterly stormwater monitoring report required under Sections 4.1.9, 7.1, and 7.3 of the 2021 MSGP.

i.    "Effective Date": The date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket.

j.    "Fully Operational": Fully installed, calibrated, and operating.

k.    "Implementing Organizations": The third-party entities, GreenRoots, the Mystic River Watershed Association, the Blackstone River Coalition, and the Nipmuc Indian Development Corporation, implementing the Supplemental Environmental Projects described in Exhibit B of this Consent Decree.

l.    "Infrastructure Improvements": The construction or implementation of infrastructure at the Facilities designed so that discharges comply with the 2021 MSGP.

m.    "Monitoring Point": The locations at the Facilities where each Facility collects stormwater samples pursuant to Section 4 of the MSGP, as

7

119222199.3 0068163-00156

identified by the applicable Stormwater Pollution Prevention Plan for each Facility.

n.    "Quarterly Inspection Report": The documentation required under Section 3.1.6 of the 2021 MSGP and Exhibit A of this Consent Decree.

o.    "Supplemental Environmental Projects": Projects consisting of water quality improvement measures and/or educational programs with the goal of promoting restoration, preservation, protection, or other beneficial impacts on water quality in the Mystic River and/or the Blackstone River watersheds. These projects will be implemented by the Implementing Organizations pursuant to the terms provided in Exhibit B.

p.    "Stormwater Pollution Prevention Plan": The plan required under Section 6 the 2021 MSGP.

q.    "Termination Date": The date on which the Consent Decree term ends, which is five years after the Effective Date pursuant to Section XII (Effective Date and Termination).

r.    "Water Quality Standards": The standards established pursuant to 33 U.S.C. § 1313 and listed at 314 MASS. CODE REGS. 4.00 *et seq.*

s.    "Worcester Stormwater Treatment": The stormwater treatment methodology selected for the Worcester Facility consisting of either:

    i.    Installation of a conveyance system to discharge the Worcester Facility's stormwater to the City of Worcester's Publicly Owned Treatment Works ("POTW"), which would require obtaining a permit from the City of Worcester; or

8

119222199.3 0068163-00156

ii.      Treatment upgrades to convert the Worcester Facility's existing detention basin into a bioretention/biofiltration facility.

13.    In the Consent Decree, unless the context otherwise requires:

a.    References to Paragraphs, Sections, and Exhibits are references to paragraphs, sections, and exhibits of the Consent Decree;

b.    The descriptive headings of the several Sections of the Consent Decree are inserted for convenience only, do not constitute a part of this Decree and shall not affect in any way the meaning or interpretation of the Consent Decree;

c.    "Include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and

d.    References to "Dollars", "dollars" or "$" without more are references to the lawful currency of the United States of America.

14.    All references to a duration of "days" shall be calendar days unless otherwise specified. In computing any period of time under the Consent Decree, where the last day would fall on a Saturday, Sunday, federal holiday, or Massachusetts state holiday, the period shall run until the close of business of the next business day.

## V.    COMPLIANCE MEASURES

15.    The Defendants shall comply with the 2021 MSGP, the Clean Water Act, and applicable Clean Water Act regulations. The 2021 MSGP and subsequent MSGPs, as may be updated from time to time, are incorporated into the Consent Decree by reference.

9

16.    The Defendants shall implement and/or maintain Best Management Practices to control stormwater at its Facilities as identified in Exhibit A. The Defendants shall continue to maintain the Best Management Practices as necessary until the Termination Date.

17.    The Defendants shall install and/or construct Infrastructure Improvements at the Facilities. The Infrastructure Improvements shall be designed for each of the Facilities to meet the requirements of the 2021 MSGP, in accordance with the schedules and processes set forth in Paragraphs 18-20.

18.    The Defendants shall install and/or construct the following Infrastructure Improvements at the Attleboro Facility:

    a.    StormwateRx Purus$^{TM}$ ion exchange polishing system added to the existing Aquip$^{TM}$ treatment system by June 30, 2023;

    b.    An asphalt berm to divert stormwater into the treatment catchment area along Bacon Street by September 30, 2023;

    c.    Perimeter containment as necessary to eliminate the discharge of untreated stormwater offsite by September 30, 2023; and

    d.    Two cleanout caps at the Maintenance Yard bioswale to replace broken caps by June 30, 2023.

19.    At the Everett Facility, the Defendants shall install perimeter controls as necessary to eliminate the discharge of untreated stormwater by September 30, 2023.

20.    The Defendants shall install and/or construct the following Infrastructure Improvements at the Worcester Facility:

119222199.3 0068163-00156

a.   Perimeter containment as necessary to eliminate the discharge of untreated stormwater offsite, including on the north and east downhill sides by September 30, 2023;

b.   A berm, curb, or equivalent to redirect flow towards the sediment basin inlet by July 31, 2023;

c.   Gutters for rooftop runoff on the automobile depollution building to direct stormwater away from the yard and storage areas by September 30, 2023; and

d.   Installation of Worcester Stormwater Treatment, as follows:

  i.   The Defendants shall determine the feasibility of the Worcester Stormwater Treatment option of discharging to the City of Worcester POTW (as defined in Paragraph 12.s.i.) and select the Worcester Stormwater Treatment option by August 31, 2023;

  ii.   The Defendants shall submit a 30% Design to CLF for review and comment by October 31, 2023;

  iii.   The Defendants shall submit the 60% Design to CLF for review and comment within four months of responding to CLF's comments on the 30% Design;

  iv.   The Infrastructure Improvements selected for the Worcester Facility shall be Fully Operational within one year of receiving all required permitting approvals. Should the Defendants find themselves unable to complete the construction/installation within

11

119222199.3 0068163-00156

the timeframe set forth herein, the Defendants shall follow the procedure provided in Paragraph 45; and

v.    The Defendants shall submit a revised Stormwater Pollution Prevention Plan for the Worcester Facility to CLF within 30 days of the Infrastructure Improvements being Fully Operational.

21. CLF shall respond to the Defendants' submission of the 30% Design and 60% Design with suggested revisions and areas for improvement, if any. The Defendants shall consider CLF's concerns and requests for revisions in good faith and respond to CLF's comments within one month of receiving the comments by either resubmitting revised plans and/or preparing a written response to CLF's comments.

22.    The 90% Design shall be substantially consistent with the Defendants' final 60% Design (including any necessary revisions) and/or written response to CLF's comments.

23.    Prior to beginning construction, the Defendants shall provide CLF with the 100% Design. The 100% Design and the constructed Infrastructure Improvements shall be substantially consistent with the 90% Design, subject to potential amendments to be discussed between the Parties if such needs arise during construction.

## VI.    COMPLIANCE MONITORING AND REPORTING

24.    After the Infrastructure Improvements are Fully Operational, the Defendants shall permit CLF and/or any CLF representatives to conduct one stormwater site inspection per Facility. The site inspection shall occur during normal business hours. During the site inspection, CLF representatives may collect samples, take photos at the Facility, and monitor compliance with the MSGP and the Consent Decree.

12

25.     By January 30 of each year until the Termination Date, the Defendants shall submit a Progress Report to CLF that describes the status of the Best Management Practices and Infrastructure Improvements, including an explanation of whether such upgrades have been completed or implemented and any delays in construction or implementation.

26.     The Defendants shall comply with all inspection, monitoring, and reporting requirements set forth in the 2021 MSGP.

27.     Starting from the date that the Infrastructure Improvements for each Facility are Fully Operational or the effective date of this Consent Decree (whichever is later), the Defendants shall conduct monthly benchmark monitoring in accordance with the requirements for quarterly monitoring under the 2021 MSGP. In the absence of a qualifying storm event, Defendants must take a substitute sample during the next qualifying storm event (i.e., if adverse weather makes sampling impossible one month, Defendants must take two samples in the following month: the substitute sample and the regularly scheduled sample). In the event there are fewer than three qualifying storm events in a quarter, Defendants must sample each qualifying storm event but are excused from the obligation to take any other samples during the quarter. At such time that the results show that a Facility's discharge did not exceed a benchmark for a parameter for nine consecutive months, that Facility will cease monitoring monthly for that parameter and will begin monitoring quarterly for that parameter through the term of the Consent Decree. For example, once the Infrastructure Improvements are constructed or installed at the Everett Facility and its monitoring results show that its discharge for nine consecutive months has not exceeded the benchmark for copper, the Everett Facility will cease monitoring monthly for copper and will begin monitoring quarterly for copper. For the purpose of calculating consecutive months of compliance, and assuming monitoring was conducted in compliance with

13

this Paragraph, a month where no monitoring was conducted for a given parameter shall be treated the same as a month where the Facility's discharge exceeded the benchmark for that parameter (except where such monitoring was excused in the absence of a qualifying storm event).

28.    Monitoring shall be conducted pursuant to the procedures and requirements in the 2021 MSGP. If monitoring is not conducted pursuant to the procedures and requirements in the 2021 MSGP, the Defendants shall submit documentation to CLF with the Quarterly Inspection Report explaining how and why monitoring deviated from the procedures and requirements of the 2021 MSGP.

29.    During the term of the Consent Decree, the Defendants shall send to CLF benchmark monitoring results, quarterly Discharge Monitoring Reports, and laboratory reports for each Facility within 30 days of the end of each calendar quarter.

30.    During the Consent Decree term, the Defendants shall send to CLF Quarterly Inspection Reports for each Facility within 30 days of the end of each calendar quarter and the Facilities' Annual Reports by January 30 of each year.

31.    During the Consent Decree term, the Defendants shall provide copies to CLF of all documents submitted to the EPA, MassDEP, or any of the municipalities in which the Facilities are located related to Clean Water Act compliance at the Facilities, Best Management Practices, or the Infrastructure Improvements. Such documents shall be provided to CLF within 30 days of the end of each calendar quarter.

32.    All documentation pursuant to Paragraphs 29-31 for the final quarter of the Consent Decree term shall be due to CLF within 45 days of the Termination Date.

### VII.    PAYMENTS

14

119222199.3 0068163-00156

A.      Supplemental Environmental Projects

33.      The Defendants shall pay a total of $525,000 to fund Supplemental Environmental Projects pursuant to the terms provided in Exhibit B on or before 90 days following the Effective Date.

34.      The Defendants shall not deduct any penalties or payments paid under Section VII (Payments) or Section VIII (Stipulated Payments) in calculating its federal, state, or local income tax.

35.      CLF will request from the Implementing Organizations annual status reports which are due each year on the anniversary of the payment deadline in Paragraph 33 while funds are being spent. CLF will arrange to have the annual status reports provided to the Defendants, pursuant to the notice provision in Section XI (Notices). The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds; and (ii) a discussion of any anticipated changes to the scope or timeline of the Supplemental Environmental Projects.

B.      Costs of Litigation

36.      Consistent with 33 U.S.C. § 1365(d), within 30 days of the Effective Date, the Defendants shall pay $109,130 by company check or other agreed upon payment method to Plaintiff, as reimbursement for CLF's attorneys' fees and costs incurred or to be incurred in this matter, including any future attorneys' fees and costs relating to the implementation or monitoring of compliance with this Consent Decree.

119222199.3 0068163-00156

C.    Late Fees

37.    The Defendants shall pay $750 per day for any payment made pursuant to Consent Decree section VII.A, VII.B, or VIII that is more than 14 calendar days late ("Late Fee").

38.    The Defendants shall pay any Late Fees within 14 days of any missed payment deadline pursuant to Sections VII.A, VII.B, or VIII of this Consent Decree.

39.    Late Fees for the late payment of Plaintiff's attorneys' fees and costs shall be paid to CLF. All other Late Fees shall be paid to the Implementing Organizations.

## VIII.    STIPULATED PAYMENTS

40.    From the Effective Date until the Infrastructure Improvements are Fully Operational, pursuant to Paragraphs 18-20, the Defendants shall pay stipulated payments to the appropriate Implementing Organization in the amount of $750 per Facility per quarter for each failure to monitor a Monitoring Point as required by the 2021 MSGP. If Defendants fail to monitor at a Monitoring Point, Defendants shall owe stipulated payments in the total amount of $750 per Monitoring Point. Stipulated payments shall not be calculated per parameter.

41.    From the date on which the Infrastructure Improvements are Fully Operational, pursuant to Paragraphs 18-20, until the Termination Date, the Defendants shall pay stipulated payments to the Implementing Organizations for the following events:

> a.    Benchmark exceedances of any monitoring parameters required by the MSGP, except for chemical oxygen demand ("COD") at the Everett Facility when chlorides measure 1,000 mg/L or greater, for which stipulated payments shall only be due if COD measures greater than 250 mg/L ("Alternate Everett COD Limit"): $1,250 for the first calendar

16

quarter following the Infrastructure Improvements becoming Fully Operational if the average of that quarter's three monthly samples exceeds a parameter's 2021 MSGP sector-specific benchmark or, in the case of COD, the Alternate Everett COD Limit. For each subsequent calendar quarter in which the average of that quarter's three monthly samples exceeds a parameter's 2021 MSGP sector-specific benchmark or the Alternate Everett COD Limit, the Defendants shall pay $7,500 per calendar quarter. For the avoidance of doubt, if this provision is triggered, the Defendants will pay a single stipulated payment per quarter per Facility.

b.      $7,500 per Facility per quarter in which there occurs any of the following Corrective Action Triggering Events:

    i.      An unauthorized release or discharge, pursuant to Section 5.1.1.1 of the 2021 MSGP, or

    ii.     A visual assessment shows odor, foam, or oil sheen in the discharge, pursuant to Sections 3.2.2.4 and 5.1.1.5 of the 2021 MSGP;

c.      $1,250 per Facility per quarter in which there occurs any Corrective Action Triggering Event not listed in Paragraph 41.b; and

d.      $2,500 per monitoring point per month for each failure to conduct monthly monitoring or, alternatively, $7,500 per quarter for each failure to conduct quarterly monitoring at a Monitoring Point required pursuant to the 2021 MSGP or Paragraph 27 of the Consent Decree. If Defendants fail to

119222199.3 0068163-00156

monitor at a Monitoring Point, Defendants shall owe stipulated payments in the total amount of $2,500 or, alternatively, $7,500 and shall not owe stipulated payments for each individual parameter that Defendants failed to monitor.

42.     From the Effective Date until the Termination Date, Defendants shall pay stipulated payments in the amounts specified below to the Implementing Organizations for the following events:

a.     $125 per day for each failure to complete and submit to EPA a report required under the 2021 MSGP;

b.     $125 per day for each failure to provide CLF with a report or other documentation required under Section VI (Compliance Monitoring and Reporting) of the Consent Decree; and

c.     $1,250 per week beginning one week after the deadline for each failure to timely complete a required action under Section V (Compliance Measures) of the Consent Decree.

43.     All stipulated payments pursuant to this Consent Decree shall be paid equally to the Implementing Organizations (each of the four Implementing Organizations will receive 25% of the total stipulated payment amount) twice per year during the Consent Decree term on August 15 and February 15. The August 15 payment shall include all stipulated payments accrued during the preceding January through June, and the February 15 payment shall include all stipulated payments accrued during the preceding July through December. Any stipulated payments which accrue between the final scheduled stipulated payment deadline and the Termination Date shall be paid within 45 days of the Termination Date.

18

## IX.    FORCE MAJEURE

44.    "Force Majeure," for purposes of the Consent Decree, is defined as any event arising from causes beyond the control of the Defendants, of any entity controlled by the Defendants, or of the Defendants' contractors that delays or prevents the performance of any obligation under the Consent Decree despite the Defendants' commercially reasonable efforts to fulfill the obligation. A minor increase in costs (less than 25%), a change in financial circumstances, or the Defendants' economic inability to comply are not Force Majeure events. Force Majeure events shall include, but not be limited to, acts of God including earthquakes, hurricanes, and other unusually adverse natural or weather conditions; war, insurrection, or civil disturbance; strikes; restraint by court order or order of public authority; supply chain constraints which delay the delivery of supplies and/or equipment by one month or more and where comparable supplies and/or equipment are not available; and delays associated with or caused by pandemics. During the period of any Force Majeure events, stipulated payments shall not accrue.

## X.    DISPUTE RESOLUTION

45.    If any event occurs that causes or may cause delay in the performance of any obligation under the Consent Decree, Defendants shall notify CLF within 10 working days of the date on which Defendants became aware of the potential delay. Upon notification, CLF shall have the right to request all necessary documentation explaining the potential delay. If requested, Defendants shall have 10 working days from the date of the request to provide the documentation. CLF shall have the right to grant all or part of any extension requested by the Defendants. If the delay in Defendants' performance of any obligation under the Consent Decree is due to a Force Majeure event and the Parties cannot reach agreement, the provisions of Paragraph 48 of this Consent Decree shall govern. Defendants shall not be required to pay

19

stipulated payments during the time between the date on which CLF receives such a request from Defendants and the date on which a final decision is issued regarding such request. If CLF denies Defendants' request for an extension, Defendants shall pay all stipulated payments that were deferred during the pendency of the request, unless Defendants invoke the process under Paragraph 48 and prevail.

46.    The Parties agree to work together in good faith to resolve any disputes prior to engaging in the dispute resolution process described in Paragraph 48 or bringing disputes before the Court as described in Paragraph 49.

47.    The following types of disputes shall be resolved pursuant to the binding dispute resolution process described in Paragraph 48:

    a.    Disputes arising from delays due to Force Majeure events as described in Paragraph 44; and

    b.    Disputes over whether Defendants have triggered an obligation to pay a stipulated payment and in what amount.

48.    If the Parties are unable to resolve any disputes listed in Paragraph 47, the Parties shall mutually select a neutral third party to make a binding determination (the "Arbitrator"). To seek a determination from the Arbitrator, the party seeking a determination shall submit documentation to the Arbitrator and provide a copy to the other party at that time. The other party shall have 14 days to respond by submitting their own documentation. If the Parties remain in disagreement after submission of the documentation, the Arbitrator shall review the submitted documentation and issue a written, binding, and non-appealable determination to both Parties simultaneously. The Arbitrator's fees shall be paid by the non-prevailing party.

119222199.3 0068163-00156

49.     Jurisdiction shall be retained by the Court to enforce the terms and conditions of

the Consent Decree, to modify the Consent Decree, and to resolve all other disputes not listed in

Paragraph 47.

## XI.     NOTICES

50.     Unless otherwise provided herein, whenever notifications, submissions, or

communications are required by the Consent Decree, they shall be made in writing and

addressed as follows:

For Plaintiff:
Clean Air and Water Paralegal
Ethan Hsi
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
ehsi@clf.org

For the Defendants
General Counsel
Schnitzer Steel Industries, Inc.
299 SW Clay Street; Suite 350
Portland, OR  97201
generalcounsel@schn.com

        and

Beth Ginsberg
Stoel Rives
600 University Street, Suite 3600
Seattle, WA 98101-4109
beth.ginsberg@stoel.com

21

119222199.3 0068163-00156

51.     Any Party may, by written notice to the other Party, change its designated notice recipient, address, or means of transmittal provided above.

52.     All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail. Any Party planning a communication by nonelectronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XII.    EFFECTIVE DATE AND TERMINATION

53.     The Effective Date of the Consent Decree shall be the date upon which the Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket (the "Effective Date"). All obligations arising under the Consent Decree shall become effective as of the Effective Date.

54.     The Consent Decree shall terminate five years after the Effective Date on the "Termination Date".

## XIII.   MODIFICATION

55.     The terms of the Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of the Consent Decree, it shall be effective only upon approval by the Court.

## XIV.   SIGNATORIES/SERVICE

56.     Each undersigned representative of the Parties certifies that they are fully authorized to enter into the terms and conditions of the Consent Decree and to execute and legally bind the Party they represent to this document.

119222199.3 0068163-00156

23

## XV.    SEVERABILITY

57.    The provisions of this Consent Decree shall be severable, and should any provision hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the parties.

## XVI.    INTEGRATION

58.    The Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XVII. FINAL JUDGMENT

59.    Upon approval and entry of the Consent Decree by the Court, the Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and the Defendant.

119222199.3 0068163-00156

## SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____    Date: _____May 5, 2023_____

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**Prolerized New England, LLC**

By: _____    Date: _____5/1/2023_____
    Michael Henderson
    Operations President, Prolerized New England, LLC

**Metals Recycling, L.L.C.**

By: _____    Date: _____5/1/2023_____
    Michael Henderson
    Operations President, Metals Recycling, L.L.C.

**Joint Venture Operations, Inc.**

By: _____    Date: _____5/1/2023_____
    Michael Henderson
    Operations President, Joint Venture Operations, Inc.

**Proleride Transport Systems, Inc.**

By: _____    Date: _____5/1/2023_____
    Michael Henderson
    Operations President, Proleride Transport Systems, Inc.

**Maine Metal Recycling, Inc.**

By: _____    Date: _____5/1/2023_____
    Michael Henderson
    Operations President, Maine Metal Recycling, Inc.

119222199.3 0068163-00156

25

Dated and entered this __8th__ Day of August , 2023 .

/s/ Angel Kelley
United States District Judge

25

**EXHIBIT A**

**BEST MANAGEMENT PRACTICES**

**I.    Best Management Practices to be Implemented by Defendants at All Facilities**

A.  Every two weeks, Defendants shall sweep (manually or with a mechanical sweeper) all paved areas at the Facilities, including around all storm drains and stormwater inlets.

B.  Every month, Defendants shall:

    1.  Inspect and remove any sediment and debris accumulation in and around the stormwater conveyance infrastructure, in and around surface flow paths at the catch basins, and on the ground surfaces surrounding each of the catch basins; and

    2.  Clean the secondary containment dikes of all diesel fuel storage tanks stored at the Facilities.

C.  Every quarter, Defendants shall:

    1.  Inspect all oil/water separators at the Facilities. Defendants shall inspect the interior of oil/water separators to determine the thickness of accumulated oil and sediment layers and inspect all inlet pipes and outlets for clogging. If the inspections identify conditions which exceed the sludge and/or oil content guidelines (1-3) listed in the *OWS Cleaning Procedures* section of the Central Massachusetts Regional Stormwater Coalition SOP 11: Oil/Water Separator Maintenance, Defendants shall remove any floating debris and trash, accumulated sediments, and/or floating hydrocarbons in accordance with the SOP. Defendants will inspect the oil/water separators

26

119222199.3 0068163-00156

monthly, document the thickness of accumulated oil and sediment layers each month, and provide that documentation with the Quarterly Inspection Report that will be provided to CLF pursuant to Paragraph 30.

D. Annually, Defendants shall:

1. Inspect and repair if necessary all catch basin inlets at the Facilities for erosion and clogging;

2. Remove the sediment in all catch basin filter inserts at the Facilities; and

3. Replace X-Tex filter fabric and straw wattles at all stormwater drains at the Facilities.

E. After large precipitation events (more than 3.5 inches in 24 hours), Defendants shall:

1. Inspect the straw wattles at the Facilities and perform maintenance as needed.

**II.   Best Management Practices to be Implemented by Defendants at the Attleboro Facility**

A. Clean the drainage channel forebay in the Lower Main Yard to remove accumulated solids whenever the accumulated sediment at the inlet reaches a depth of six inches. Defendants will inspect the drainage channel forebay monthly, document the sediment depth each month, and provide that documentation with the Quarterly Inspection Report that will be provided to CLF pursuant to Paragraph 30;

B. Remove and replace deteriorated hay bales annually; and

C. Inspect the Aquip$^{TM}$ units every six months and perform maintenance as needed, including replacing media.

27

**III.**   **Best Management Practices to be Implemented by Defendants at the Everett Facility**

   A.  Clean drainage channels 6A and 6B in the southeast corner of the site whenever the accumulated sediment at the inlets reaches a depth of six inches. Defendants will inspect drainage channels 6A and 6B monthly, document the monthly sediment depth, and provide that documentation with the Quarterly Inspection Report that will be provided to CLF pursuant to Paragraph 30; and

   B.  Inspect the Watertectonics electrocoagulation treatment system once per quarter and perform maintenance as needed, including replacing electrodes and media if necessary.

**IV.**   **Best Management Practices to be Implemented by Defendants at the Worcester Facility**

   A.  Clean the stormwater detention basin forebay semiannually; and

   B.  Clean out the settling basin whenever the depth of accumulated sediment adjacent to the outfall structure reaches one foot. Schnitzer will inspect the settling basin monthly, document the monthly sediment depth, and provide that documentation with the Quarterly Inspection Report that will be provided to CLF pursuant to Paragraph 30.

119222199.3 0068163-00156

**EXHIBIT B**

**I.      SUPPLEMENTAL ENVIRONMENTAL PROJECT DESCRIPTION**

**PROJECT 1: WATERFRONT REMEDIATION AND DAM REMOVAL IN CHELSEA CREEK AND MILL CREEK.**

Implementing Organization: GreenRoots

Project Funds: $175,000

**Waterfront remediation.** At the Chelsea Creek, Mill Creek, and Island End River waterfronts, GreenRoots will conduct soil testing and remediation, invasive species removal, climate resiliency planning and implementation, and meaningful public engagement throughout all of these processes. This project will improve water quality, create healthier estuarine environments, promote climate resilience, and ensure public access. Work will include, as necessary: soil testing and/or remediation, bank stabilization to prevent erosion, landscaping, green infrastructure, removal of phragmites and other invasive species, salt marsh and other habitat restoration, and/or tree plantings.

**Dam removal.** GreenRoots will work with the City of Chelsea and Mystic River Watershed Association to remove Slades Mill Dam. Slades Mill Dam is a silt dam located on Mill Creek which is impacting tidal flow and has resulted in an environment that is conducive to the spread of the invasive species phragmites. Removal of this dam will improve water quality and strengthen the health of the river ecosystem.

**PROJECT 2: WATER QUALITY MONITORING IN THE MYSTIC RIVER WATERSHED**

Implementing Organization: Mystic River Watershed Association (MyRWA)

Project Funds: $100,000

In the Mystic River Watershed (in the vicinity of the Everett Facility), MyRWA will conduct sampling work that will include monthly monitoring of pollutant levels for three years at

29

six sites. Following the sampling and laboratory analysis of samples, MyRWA will identify hotspots of high pollution levels and communicate the sampling results to the public and decision makers in order to prioritize and accelerate the implementation of water quality solutions.

In addition, MyRWA will execute an investigation focusing on three long-neglected streams in the Mystic River Watershed which run through environmental justice communities—Malden River, Alewife Brook, and Mill Creek. For many years, these three streams have been impaired by contaminated stormwater and have received failing or near-failing grades in the EPA-MyRWA Water Quality Report Card. MyRWA will analyze available data and conduct new investigations on these three streams, and then present the findings to the public and municipalities. The purpose of the public forum will be to identify, in collaboration with the public, solutions to the water quality issues caused by stormwater pollution.

**PROJECT 3: ENVIRONMENTAL QUALITY ASSESSMENT OF CONTAMINATED SEDIMENT IN THE BLACKSTONE RIVER**

Implementing Organization: Nipmuc Indian Development Corporation (NIDC)

Project Funds: $100,000

NIDC will evaluate recent studies documenting the water quality of the Blackstone River, the survival of native plants and wildlife along the banks of the River, and the survival of fish within the water. In addition, testing will be conducted on the levels of chemical, biological and other contaminants within the Blackstone River. An analysis will be done on the testing results to assess the possibility for mitigating contaminants and restoring the River's health.

NIDC will present the results of the testing and analysis to the Hassanamisco Band of Nipmuc, including the feasibility of implementing mitigation measures, the feasibility of the River's survival, and whether humans and their more-than-human kin (nature and wildlife) will once again be able to drink and eat from the River. The results will also be made available to

119222199.3 0068163-00156

the public for the purpose of generating further local support for improving the River's water quality.

**PROJECT 4: WATER QUALITY IMPROVEMENTS IN THE BLACKSTONE RIVER WATERSHED**

Implementing Organization: Blackstone River Coalition (BRC)

Project Funds: $150,000

**Water quality monitoring.** Volunteer members of the Blackstone River Coalition (BRC) will collect water quality samples at 75 sampling sites throughout the Blackstone River Watershed once per month between April and November. Volunteers will perform in situ tests of dissolved oxygen, temperature, and stream depth and collect grab samples for laboratory analysis by a BRC field coordinator and lab volunteers. The results of this sampling will help member groups of the BRC and other stakeholders better understand the assets and threats to the watershed and advocate for actions that will improve the water quality of the Blackstone River. BRC will include the sampling results in public-facing materials to illustrate the ongoing need for river protection and foster a sense of stewardship in the general public.

**Restoration of Granite Park.** Granite Park, along the Blackstone River, has fallen into disrepair with invasive plants destroying native habitat and access to the Blackstone River. Blackstone River advocates will restore Granite Park by removing invasive knotweed plants, planting native trees to create native bird habitat; planting native pasture grass; clearing access to the Blackstone River for water quality testing by BRC; and mowing knotweed three times per year.

**Urban stormwater public education.** Blackstone River educators will partner with schools in Worcester and Millbury to lead students in field activities along the Blackstone River and bike trail, including litter pickup, water quality monitoring, and control of invasive species

31

119222199.3 0068163-00156

(such as bittersweet and multiflora rose). Students will also install pet waste bag dispensers and multilingual signage about pet waste and littering along the Blackstone River bike trail.

## II.    GENERAL OBLIGATIONS AND REPORTING

**Annual Reports.** Each Implementing Organization will submit to the Parties, pursuant to the notice provision in the Consent Decree, an annual status report due on January 31 of each year that funds are being spent. The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds and (ii) a discussion of any anticipated changes to the scope or timeline of the Supplemental Environmental Projects.

**Unspent Funds.** Any Project Funds that remain unspent as of five calendar years after the date of entry of the Consent Decree by the Court will be directed to community environmental projects in Massachusetts that are similar to or serve similar purposes as the Supplemental Environmental Projects. In the event that unspent Project Funds exist, the Implementing Organization will submit to the Parties an accounting of such funds and a description of the intended use for such unspent Project Funds.

119222199.3 0068163-00156